5L 291
11L 512

## JOHN A. EPPERSON v. THE STATE.

1. CRIMINAL LAW. *Plea in abatement.* It is not a good plea in abatement to an indictment that one of the grand jurors who found the indictment was not one of the *venire* selected by the county court to serve as jurors, that the *venire* was not exhausted in impaneling the grand jury, and that more than thirteen of the *venire* were in attendance and could have been selected. The mere fact that a juror, otherwise qualified, had been selected from the bystanders instead of a juror from the *venire*, would be no ground for abating an indictment found by him and twelve grand jurors taken from the *venire*.

2. SAME. *Same. Plea of waived.* By pleading not guilty and going to trial, the defendant waives a plea in abatement on which no action is taken.

3. SAME. *Indictment. When certified copy may be read.* After the jury have been impaneled and sworn, the trial court may, under the Code, sec. 5130, permit a certified copy of the original indictment to be read upon proof that the original indictment has been lost or mislaid, without a formal adjudication of loss and order of substitution, and the affidavit of the clerk of the court that he had made diligent search among the papers of his office and was unable to find the indictment, is *prima facie* sufficient evidence of the fact.

4. SAME. *Evidence before committing court must be identified.* It is not error, upon the trial of an indictment, for the court to refuse to allow the defendant to read, with a view to contradict a witness for the State, a paper purporting to be the testimony of the witness taken upon the preliminary examination before the committing justices, signed with his mark, and found among the papers in the cause, the paper not being identified by proof, nor shown to have been signed by the witness or by his authority.

5. SAME. *Dying declarations reduced to writing. Parol evidence.* It is not a sufficient error for reversal that parol testimony was admitted, on a trial for murder, of the dying declaration of the deceased that the defendant had killed him, made at the same time a dying statement was taken in writing and signed by the deceased, without the production of the writing, the written statement not having been called for

by the defendant when the person who took it, and stated the fact, was examined as a witness, similar parol declarations having been given by witnesses without objection, and the proof leaving no doubt that the deceased was actually killed by the defendant.

6. SAME. *Murder. When malice is presumed.* On a trial for murder, there is no error in the charge that where the State proves the fact of killing, without more, malice is presumed until the contrary appears from the direct or circumstantial evidence in the case, whether offered by the defendant or existing in the evidence of the State.

FROM WASHINGTON.

Appeal in error from the Circuit Court of Hancock county. NEWTON HACKER, J.

F. M. FULKERSON for Epperson.

ATTORNEY-GENERAL LEA for the State.

COOPER, J., delivered the opinion of the court.

The prisoner, John A. Epperson, having been convicted of the crime of murder in the second degree, has appealed in error to this court.

The defendant pleaded in abatement of the indictment that John Livingston, one of the grand jurors who found the indictment, was not one of the *venire* selected by the county court to serve as jurors at that term of the court, that the *venire* was not exhausted in impaneling the grand jury, and that more than thirteen of the *venire* were in attendance and could have been selected as grand jurors. To this plea the State demurred, upon the ground that the facts stated fail to show that the said John Living-

ston was not regularly drawn and impaneled as one of the grand jury, or that twelve legally competent grand jurors, exclusive of John Livingston, did not concur in finding the indictment. The circuit judge sustained the demurrer, and his action is assigned as error. A plea in abatement will lie to the qualification of a grand juror, but such pleas are not favored in law, and are construed with great strictness. *The State* v. *Bryant,* 10 Yer., 527. This plea undertakes to go a step further, and, without contesting the qualification of the juror, seeks to question his right by showing that there were other competent jurors who ought to have been selected. The facts stated are, however, not sufficient to establish the point. For, although a sufficient number of the *venire* may have been in attendance, and might have been selected, *non constat* that they were not excused for good cause. Besides, the plea fairly implies, what the record shows, that the grand jury which found the indictment consisted of thirteen members, and it does not negative the fact that the indictment was found by twelve competent jurors. The concurrence of twelve qualified jurors is sufficient. *Pybos* v. *The State,* 3 Hum., 49. Whether the disqualification of one member of the grand jury, whose twelve qualified associates have in connection with him found a true bill, would be sufficient to abate the indictment, may admit of discussion. *The State* v. *Duncan,* 7 Yer., 271. But, clearly, the mere fact that a juror, otherwise qualified, had been selected from the bystanders instead of a juror from the *venire,* would be no ground for abating an

indictment found by him and twelve grand jurors taken from the *venire*.

The defendant also pleaded in abatement that the name of the prosecutor was put on the indictment without his knowledge and against his will. It is assigned as error that the defendant was tried without any action having been taken on this plea. But the defendant had the right to abandon the defense if he found that the fact pleaded was not true, or for any other reason. By pleading to the merits and going to trial, the defendant waived his plea in abatement.

It is further assigned as error that the court, after the jury were impaneled and sworn, permitted the attorney-general to read a certified copy of the indictment from the minutes, upon proof that the original was lost or mislaid, and without a special order of substitution. The proof consisted of the affidavit of the clerk of the court that he had made diligent search among the papers of his office and was unable to find the indictment. The Code, sec. 5138, provides that all indictments for offenses of the grade of felony, returned by the grand jury as a true bill, "shall be entered by the clerk with the return in full on the minutes of the court, and the originals compared with the entry of the judge before he signs the proceedings of the day." By sec. 5139, "a copy of the minutes shall be as good and valid as the originals, if at any time the latter are lost, destroyed, misplaced or purloined. Previous to the statute, a copy of a lost record could only be substituted by order of the court, adjudging

that the original was lost and authorizing the substitution of the copy. *State* v. *Harrison,* 10 Yer., 542. The object of the statute was to do away with the difficulties attending the supply of such papers, as shown by the case cited, and to provide a record copy of the original. "At any time," when the exigency arises, the copy may be used. The copy is virtually equal to the original. *Currey* v. *The State,* 7 Baxt., 154. The statute is remedial, and should be liberally construed in furtherance of the ends of justice whenever it is clear that the defendant has not been prejudiced by what has been done. The court must determine when the exigency arises under the statute, and this may be done as well by action during the trial as by special order. The clerk being the proper custodian of the indictment, his affidavit of diligent search would be *prima facie* evidence of loss. The averment by the clerk of search among the papers of his office is more satisfactory than if, as contended for by counsel, he had averred a search in his office, for it fairly implies a search among those papers wherever found. There was no error, therefore, in allowing the copy of the indictment to be read on the trial.

It is again assigned as error that the court refused to allow the defendant to read, with a view to contradict the principal witness of the State, "a paper that purported to be" the testimony of the witness taken upon the preliminary examination before the committing justices, signed with his mark, and found among the papers of the cause. Undoubtedly, the

examination on the preliminary trial, if identified and proved to have been signed by the witness or at his request, would have been competent evidence for the purpose proposed. *Titus* v. *The State*, 7 Baxt., 132. Whether it could be thus used without first presenting it to the witness, it is unnecessary to consider. The paper offered was not identified, nor proved to have been signed by the witness or by his authority. The court did not err, therefore, in excluding it.

Another error assigned, is the admission of parol testimony of the dying declarations of the person for whose murder the defendant was on trial. The deceased was wounded early in the morning, and died about ten o'clock that night, being conscious from the first that his wounds were mortal. One of the State's witnesses, without giving the statement of the wounded man, says: "I took a written statement of his dying statement, which he signed. I think he spoke of dying before I took his statement." The next witness testifies: "He said, before I asked him about dying, the defendant had killed him. He said this at the time his written statement was taken." The defendant objected, the bill of exceptions says, at this place, "to the introduction of parol testimony to the dying declaration of the deceased, on the ground that the same had been reduced to writing." Another witness says she went to the wounded man in the forenoon and staid most of the day. "I talked with him," she adds, "through the day, and he said he would die. He said that the defendant killed him, and said so several times through the day." A fourth

Epperson *v.* The State.

witness deposes to a similar conversation. No objection seems to have been taken to the testimony of these witnesses. Three witnesses, who are examined, were present at the time the wounds of the deceased were received, and their testimony leaves not a particle of doubt that the wounds were inflicted by the defendant. Under these circumstances, the question arises whether there is such error in the admission of the oral testimony of the declaration objected to as requires a reversal for that cause.

Where the dying declaration sought to be admitted consists of a single declaration reduced to writing, the inclination of the courts has been to require the production of the writing as the best evidence of the declaration. 1 Greenl. Ev., sec. 161. The rule has been somewhat relaxed where the declarations have been repeated at different times, at one of which they were made under oath and informally reduced to writing by a witness. *Rex* v. *Reason,* 1 Str., 499. Where the statement was reduced to writing by the justice before whom the defendants were examined, and sworn to but not signed by the deceased, the holding of this court was that the writing was not admissible as original evidence at all, but only as secondary evidence in the event the justice could not recollect the statement. *Beets* v. *State,* Meigs, 106. Where the life or liberty of a prisoner may turn upon a single declaration reduced to writing, it may be necessary to critically review the authorities with a view to the adoption of the true rule governing the admission of oral testimony touching the same

declaration.    But it is difficult to see any principle
upon which parol testimony of independent declarations
can be excluded merely because one of the declarations
has been reduced to writing and the writing is not
produced.    In this case, the witness who took down
the statement in writing does not testify what the
declaration was, nor is he asked by the defendant to
produce the writing.    It is the next witness who de-
poses to a declaration, which, he says, was made at
the time the written statement was taken.    If his
testimony was of the same declaration that was re-
duced to writing, the objection was, upon principle,
well taken.    If, however, it was an independent decla-
ration made at the same interview, the question would
admit of more doubt.    Be this as it may, the evi-
dence admitted was, in view of the similar declara-
tions testified to without objection, and of the positive
evidence of the witnesses present when the wounds
were inflicted, utterly immaterial and harmless.    To
grant a new trial under such circumstances, would be
to pervert a rule intended for the furtherance of jus-
tice to the hindrance of justice.    Ordinarily, where
improper evidence has been admitted, this court will
not consider the weight which ought to be given to
it by a jury, and will allow the prisoner the benefit
of a doubt.    But in this case there can be no doubt.
The killing was the act of the defendant, and the
only question left open for consideration was, and is,
whether any and what crime was thereby committed.

It is suggested, rather than argued, by one of the
counsel for the prisoner, that a clause of his Honor's

charge to the jury goes "beyond the verge of the law, or, at least, was calculated to mislead the jury." That clause is: "Where the State proves the fact of killing, without more, malice is presumed until the contrary appears from the direct or circumstantial evidence in the case, whether offered by the defendant or existing in the evidence of the State." But this language is in strict conformity with the rule laid down by this court in *Bryant* v. *State*, 7 Baxt., 67, 74.

The last argument made on behalf of the defendant is that the verdict is not sustained by the evidence. The record discloses a terrible domestic tragedy. The prisoner has been tried and convicted of the murder of his father, who undoubtedly died from the wounds inflicted by him. In a personal struggle at the same time between two of the brothers of defendant, both of whom are witnesses in this cause, their mother and one of their sisters were killed by shots from a pistol in the hands of one of the brothers. One of these brothers is the prosecutor and the principal witness for the State, while the other is a witness for the defense. The fact that the feelings engendered by the family feud and family slaughter may color the testimony, justifies and requires the exhaustive argument of the counsel and the careful scrutiny of the court. The proof of a medical witness shows that the death of the deceased was occasioned by two wounds, produced by a sharp-pointed cutting instrument, one in the abdomen and the other in the right side, cutting through a rib. Both stabs penetrated the cavity of the body, and either would probably have been fatal.

Three witnesses, two brothers and one sister of the defendant, were present when the fatal wounds were given. Thomas Epperson, one of the brothers, was introduced as a witness by the State. The other brother, George Epperson, and the sister, Mary Epperson, were called for the defense. The guilt or innocence of the defendant turns upon the testimony of these witnesses. There is very little conflict in the testimony, so far as the material facts are concerned, and it will simplify the examination to give first the story of the defendant's witnesses.

J. N. Epperson, the deceased, and father of the defendant and the three witnesses, had, on the night before the difficulty, and while· under the influence of liquor, abused his wife, the mother of the defendant and witnesses. The defendant, it seems, had a still about one · mile from the residence of the father, at which he and George were on the next morning. George went home early, and then returned and told defendant that the father had abused the mother the night before, and she wanted him to go and stay with her until the father became sober. The defendant had a large knife, with a blade six inches long, sharp on both edges, which did not shut, and which he had recently bought. George says he did not see the defendant get the knife, but heard him say something about it, and defendant asked him where it was. George and his sister both say they saw this knife at their father's place after the difficulty, and the sister says she found it immediately thereafter in the room where the fight occurred, and it had blood on it.

George and defendant went together to the house. When they entered, the father asked, with an oath, what they were doing there. The defendant replied, "you know," and made a remark about the abuse of his mother. The father started for his gun at the foot of the bed, was caught by the son, and, thereupon the two came to blows, and the defendant, who had lost his right arm by an accident, kicked the father several times, until, according to the daughter's testimony, the father fainted. Afterwards, the defendant and George took their breakfast, and were preparing to leave when Thomas Epperson came in. The father was then sitting on the bed with his wife and one of the daughters, complaining of the bruises he had received in the fight. Angry words passed between Thomas and defendant on the subject of the treatment of the father by the latter, when the mother interposed and took Thomas out of the room. In a few minutes, and while they were absent, the father walked to the door and got a drawing-knife, eighteen inches long by one and three-fourth inches broad, and struck the defendant over the head and shoulders with it, calling at the same time upon Thomas to come and help him. The defendant, according to the two witnesses, was standing, before the assault, doing nothing. The blows cut through the defendant's hat and coat, the hole in the hat being about two inches long, and, George and Mary say, wounded the defendant on the head and neck. The witnesses do not describe the wounds, nor is there any other proof on the subject. The mother and a black servant caught the

drawing-knife and attempted to wrench it from the father. . About this time Thomas came to the door with a drawn pistol, and he and George, after a rapid interchange of words, engaged in conflict. In their struggle they knocked a baby into the fire. Their sister Nancy undertook to pick the child from the fire, when she was hit by a shot from the pistol, of which wound she afterwards died. Mary then seized the child and set it out of the door. When she came back, her father and the defendant had quit fighting. Thomas and George were still struggling over the pistol, but one or both of them went out of the . room, and Thomas fired back, killing his mother. Neither George nor Mary say a word about the wounding of the father, nor what either he or defendant did after they ceased fighting.

Thos. Epperson supplies these omissions. He says that the defendant came to his house, with their brother George, that morning, and said that father had abused mother, and he was going up to give him hell, at the same time pulling half out of his pocket the two-edged knife above described. Witness told defendant to wait and he would go with him, but defendant said he had no time, and went on. Witness followed in about an hour. His statement of what took place at his father's is substantially in accord with the testimony of the other two witnesses until he left the room with his mother. He then says he heard his father call to him, and went in the house. The defendant had the father pushed back against the door, the father still holding the drawing-knife, which was

also held by some person, witness thought it was George, who wrenched it from him. Witness saw the defendant stab his father in the stomach with the knife described, driving it up to the hilt, half drawing it out and driving it in again. The witness further deposes that he saw the defendant stab the father the second time in the back, or the side near the back, after the father had turned to leave the room, or had left it, with his back or side to the defendant. The bill of exceptions does, in one place, make the witness say that the second stab was made as the father went out of the door, and the language would imply that he turned to go out "directly" after the first stab. Elsewhere the witness states that the father had stepped down the one step which led from the room when the second stab was given, and that the blow was given in the porch outside of the door. He adds: "When the last stab was given, I was standing in the yard some fifteen feet away."

It will be remembered that Mary testifies that when she returned into the room after putting the baby out of the door, the defendant and his father had quit fighting, but that Thomas and George were still struggling over the pistol. There must have been an interval of time, though it may have been a short one, after the cessation of hostilities between defendant and his father, before Thomas could, while standing in the yard fifteen feet away, have seen the defendant stab the father the second time in the porch. The other witnesses do not contradict the statement of Thomas in this regard. They are simply silent. George is

equally silent as to what took place in his presence, as deposed to by Thomas, at Thomas's house when he and defendant were on their way to their father's. Thomas's character is not impeached, nor is his testimony contradicted in any material point. It was for the jury to weigh his testimony, and if they believed it they might well find that the defendant had provided himself in advance with a deadly weapon in anticipation of a fight with his father, and not for the mere defense of his person against a felonious assault, and that there was actual malice. They might further find, in view of the feeble condition of the father, the little injury inflicted by his blows, and the fact that the drawing-knife was immediately seized by other members of the family so that it could not be again used, that the provocation was resented in a brutal and ferocious manner, evincive of a malignant disposition to do great mischief, out of all proportion to the offense, or of a savage disregard of human life. They might further find that after the provocation, and between the first and second stab, there was time for passion to subside and for reason to resume her empire. In either view, the verdict would be justified. It seems difficult to believe that a son, who had inflicted a terrible wound on the father in retaliation for comparatively harmless blows, could, even after a barely appreciable interval of time, inflict another blow with such brute force as to sever a rib into two pieces. But one witness in this record, not a member of the family, testifies that after the difficulty, when the neighbors had come in, the defendant

was hunting and inquiring for his knife, and said to his father, with an insulting epithet, that he would make him groan worse than he was then doing.

There is no error in the judgment, and it must be affirmed.